# Exhibit 2

# (Part 1)

# FREEDOM COURT REPORTING

Page 1

1          IN THE CIRCUIT COURT OF HOUSTON COUNTY

2                    STATE OF ALABAMA

3                                        )

4     JEARLDEAN THOMAS,                   )

5                                        )    **COPY**

6          Plaintiff,          )

7                           )      CV#

8                           )    1:05cv914-F

9     Vs.                              )

10                                     )

11    UTILITY TRAILER MANUFACTURING CO.)

12    DBA UTILITY TRAILER CORPORATION, )

13                                     )

14          Defendants.          )

15

16                    S T I P U L A T I O N

17          IT IS STIPULATED AND AGREED by and

18    between the parties throught their

19    respective counsel, that the deposition of

20    JEARLDEAN THOMAS may be taken before

21    Meliaha Cornelius, Commissioner, at the

22    conference room of the Holiday Inn Dothan-

23    South, 2195 Ross Clark Circle, Dothan,

# FREEDOM COURT REPORTING

Page 35

```
1      Q.    Right.

2      A.    No.

3      Q.    Okay.  Other than in your tax

4  matter, have you ever testified in court?

5      A.    No.

6      Q.    Have you ever been in the

7  military?

8      A.    No.

9      Q.    Okay.  And you did graduate from

10  high school; correct?

11      A.    Correct.

12      Q.    Did you attend college?

13      A.    I did maybe a quarter, and then I

14  realized that wasn't for me.  But this was

15  -- this was -- see I finished high school

16  in 1968, then I enrolled in Wallace Junior

17  College, and I think I went for maybe a

18  quarter, maybe not even a quarter, and I

19  realized that's not what I wanted.

20      Q.    Did any of your classes at Wallace

21  pertain to welding?

22      A.    No.  No.

23      Q.    Okay.  I understand that you know
```

## FREEDOM COURT REPORTING

Page 38

to know how I came into it?

Q. I want to know all the training that you've had in welding.

A. Okay. You want me to start from the very beginning?

Q. That would be helpful if you could go in order.

A. Go in order. Yes, I can. I'm going back to when I first learned how to weld, okay?

Q. Okay.

A. I'll try to remember. I started -- I was contacted by Mr. Grady Hendrix. He's deceased now, but he worked at the Enterprise Employment Service. When it was located out there at West Gate on the corner on the hill. Mr. Grady, he knew I had been in there several times looking for jobs, and I had no welding experience at this time, and so he called me in and says, I have a company that needs a minority welder. I said, well, why you calling me? And he said, well, what we want to do, he

## FREEDOM COURT REPORTING

Page 39

1   said if this is agreeable to you, we want

2   to send you to some classes and want you to

3   learn how to weld.  They will hire you at

4   this plant.  They needed a black person.

5   They needed a woman.  Because this is a

6   government contract in order for us to get

7   it and to proceed with it, this is what

8   they had to do.  And I was agreeable, and I

9   said okay, you know, he sent me over to

10  Enterprise High School at night.

11      Q.   This is 1972 or '73?

12      A.   This is 1972 or '73.  Mr. Arnette

13  was a daytime -- he was a daytime welding

14  instructor for the school over there, so

15  that's where I learned how to weld.  That's

16  where I learned how to weld.  At first, I

17  went to school I would say about three or

18  four weeks, and I really didn't think that

19  that was my calling so I stopped, but Mr.

20  Grady called me back, and he asked me would

21  I go back and try it again.  I'm assuming

22  that I was the only one they could find

23  that was willing to do that at the time so

**FREEDOM COURT REPORTING**

1    completing the high school class?

2        A.    Yeah, see, I went at night.

3        Q.    Well, let's not talk over each

4    other.  Let me finish the question before

5    you answer so that the record's clear.

6        A.    Okay.

7        Q.    Let me just restate that so the

8    record's clear.  You did not get any kind

9    of paper as a result of completing that

10   high school course?

11       A.    No.

12       Q.    Okay.  Tell me what was the next

13   course that you took in welding.

14       A.    That was -- that was basically it.

15       Q.    Any other training that you've had

16   in welding?

17       A.    I wouldn't say training.  I

18   wouldn't say training because I haven't had

19   any more training, no.  Maybe I've

20   refreshed myself from time to time, but it

21   wasn't in  -- at a school or anything of

22   that nature.

23       Q.    Okay.  So you talked a minute ago

# FREEDOM COURT REPORTING

Page 44

1    about the in-house certifications that

2    people do.  Do you have any independent

3    certifications meaning certifications that

4    would be recognized by any employment?

5        A.   No.

6        Q.   You're not certified by the

7    American Welding Society?

8        A.   No.  I don't see the -- I don't

9    see the sense in being certified with the

10   United States unless I was going to work on

11   a shipyard.  Now, they -- that's what they

12   require.  Because it's like I already

13   stated, even if you do certify with these

14   places, when you apply for a job, you're

15   going to have to take this already.  They

16   do not -- most of them do not take that

17   into consideration. Just because I passed

18   that test does not mean that I would pass

19   their test.

20        Q.   Other than the quarter that you

21   took at Wallace Community College, can you

22   recall any education since high school?

23        A.   No.

# FREEDOM COURT REPORTING

Page 45

Q. Okay. And you don't hold any other licenses or certifications?

A. No.

Q. In anything else?

A. No.

Q. Let's talk now about your employment history. What I'd like to do to the extent you can is get a list of all of your employers since you left high school.

A. Wait, wait. Haven't y'all gotten that already? When ya'll sent out request for production, hadn't ya'll already gotten that?

Q. We've sent out some subpoenas. Is that what you're referring to?

A. Okay.

Q. But I don't have any comprehensive list of all your employers since high school, and it would be helpful to me to get that now. To the extent you can, it would be helpful to me if you could do them in order from when you left high school to today.

# FREEDOM COURT REPORTING

Page 96

1    Q.    I want to make sure that I have a
2 complete list of everything that you're
3 claiming in this lawsuit.  As I understand
4 it, you're claiming that Utility Trailer by
5 failing to hire you in October 2004
6 discriminated against you based on race or
7 sex or else retaliated against you because
8 of you filing an EEOC charge against them
9 previously; is that correct?
10    A.    Yes, that's correct, but the
11 attorney that drew this up for me, she put
12 down -- she put in race -- she said she
13 wanted to make sure she got it all.  She
14 got everything in, but yes, she put down
15 race, but it was more or less gender.
16 Yeah.
17    Q.    Okay.  So do I correctly
18 understand you to say that you're really
19 only alleging discrimination based on sex
20 in this lawsuit and not discrimination
21 based on race; is that correct?
22    A.    No.  No.  I'm not -- it's never
23 been based on race because you've got men

# FREEDOM COURT REPORTING

1    in there.  You've got --

2         Q.    In other words that is correct.

3    You are not claiming race discrimination in

4    this lawsuit?

5         A.    Race discrimination, no.

6         Q.    You are only claiming sex

7    discrimination in this lawsuit; is that

8    correct?

9         A.    And retaliation.

10        Q.    Is that correct?

11        A.    Uh-huh.

12        Q.    Yes?

13        A.    Yes.

14        Q.    Anything else that you're claiming

15   that Utility Trailer did wrong in this

16   lawsuit besides failing to hire you in

17   October of 2004?

18        A.    You know, it's not the fact that

19   they failed to hire me.  It's the fact that

20   -- now, on some of the documents that I

21   have at home from Utility Trailers is the

22   reason that -- it's the reason stating that

23   the very reason and it says on there, the

# FREEDOM COURT REPORTING

1    Q.    You told me about the incident

2  where he told you to go get a woman's job.

3    A.    A woman's job.

4    Q.    Did he tell you anything else?

5    A.    He just kept ranting and raving.

6  I mean, stamped his foot and everything.

7    Q.    Okay.  I mean on any other

8  occasions.

9    A.    No, because after that I didn't --

10  after that -- I knew I was not going to get

11  a job there as long as Bill Woodham was

12  there.

13    Q.    Okay, and when was it that he made

14  that comment to you?

15    A.    I don't remember.  It was sometime

16  before he left.  It was some months before

17  he left.  It was a while before I had the

18  welding test because my cousin was James

19  Moore, and he was still working there.

20    Q.    Do you know the decade it would

21  have been?  '80s?  '90s?

22    A.    No, James hasn't been dead that

23  long.  I think maybe three years, maybe

# FREEDOM COURT REPORTING

Page 104

1  four years, something like that. So it had

2  to have been before then.

3      Q.    So what decade would that be?

4      A.    It was in the '90s.

5      Q.    Let's go back to my original

6  question which was whether it was dealing

7  with making sure I have a complete list of

8  everything you are claiming in this

9  lawsuit. And what I wanted to know was, if

10 you are claiming that Utility Trailer acted

11 unlawfully with respect to anything else

12 besides not failing to hire you in 2004,

13 and you told me what Bill Woodham did.  Is

14 there anything else you are claiming in

15 this lawsuit?

16     A.    Okay.  They're saying that the

17 reason they didn't hire me is because I had

18 no recent welding experience.  Okay.  And

19 then when I got this information back from

20 EEOC, EEOC got a list of people that they

21 hired and people that had applied.

22     Q.    Okay.  Let's go back to this

23 document. You explained a minute ago that

# FREEDOM COURT REPORTING

Page 105

you disagreed with their reasons, and I understand that, and we'll talk some more about that in a minute. Right now I just want to get a list of all of the actions that they took that you believe were unlawful.

I understand that you believe the actions they took were unlawful with respect to not hiring you in October 2004, and you also told me what Mr. Woodham did. Did Utility Trailer take any other actions against you that you believe were unlawful that you are claiming in this lawsuit?

A.    Would that pertain to hiring someone that had less experience than me?

Q.    Are you talking about in October 2004?

A.    Uh-huh.

Q.    I understand that you have that claim. I'm just trying to find out if you have any other claims.

A.    No.

Q.    Okay. Let's look at your EEOC

## FREEDOM COURT REPORTING

1    copy of the document issued by the EEOC?

2            (Whereupon Defendant's Exhibit 10

3            was marked for identification

4            and copy of same is attached

5            hereto.)

6    A.    Uh-huh.

7    Q.    That dismissed your charge.  That

8    was a yes?

9    A.    Yeah.  Yeah, I talked to -- she

10   had already told me when she got that

11   information that they were short -- because

12   I didn't understand the whole thing and

13   then she told me that they -- they didn't

14   examine -- they didn't investigate it to

15   the fullest, and she said that's why I got

16   the civil rights -- that's why I got the

17   notice of rights thing here.  And she told

18   me I had within 90 days here to file it.

19   Q.    All right.  You told me earlier

20   that you had another EEOC against Utility

21   Trailer at some point in time before this,

22   and I promise you we can come back and talk

23   about that.  I don't believe you ever told

# FREEDOM COURT REPORTING

Page 108

1  me what year that was that you filed that

2  other EEOC charge against Utility Trailer.

3      A.   It was before this.  I actually do

4  not remember -- I do know it was before

5  they started operations -- before they

6  started -- before they started up.  Because

7  they had these classes and they wanted to

8  teach people to do it their way as opposed

9  to doing it -- doing it -- however they had

10  did it.

11      Q.   Does 1983 sound right?

12      A.   Could have been.

13      Q.   And the reason you filed that

14  charge was because you wanted to get into

15  the class they were holding; is that

16  correct?

17      A.   Yes.

18      Q.   Okay.  And they did let you into

19  the class after you filed that charge;

20  correct?

21      A.   Uh-huh.

22      Q.   That's a yes?

23      A.   Yes.

# FREEDOM COURT REPORTING

Page 109

1    Q.    And did you ever file any other

2    EEOC charges against Utility Trailer

3    besides the one in November 2004 or the one

4    in about 1983?

5    A.    No.

6    Q.    Did you ever file any other EEOC

7    charges against anybody?

8    A.    No.

9    Q.    Okay.  I also told you that we'd

10   come back and talk about the other

11   applications you said you filed with

12   Utility Trailer.  Can you please list for

13   me verbally every time you applied for

14   employment with Utility Trailer?

15   A.    Before this last time, I had

16   filed, I filed two this last time because I

17   came in -- because I had read it in the

18   paper, I came in and filled out one and

19   then I went to the employment office and

20   filled out another one.  Because they gave

21   me a card, and I came back, and I gave it

22   to Ms. Cannon.  And yeah, I had filed some

23   previously, but I can't be specific about

## FREEDOM COURT REPORTING

Page 110

1   what dates that was.

2      Q.   Okay.  Well, you said one was when

3   they first started up; correct?

4      A.   That's when I filed the charge

5   against them, yeah.

6      Q.   Okay.  And then how long was it

7   after that you filed your next application

8   for employment with them?

9      A.   Well, after they got through with

10  the classes -- and like I said, I was the

11  only woman in that class -- and I wasn't

12  one they picked for the class -- out of the

13  the class to start up -- I expected that.

14  I expected that.  And so I didn't file

15  another one for several -- for several --

16  maybe, it might have been a year.

17          I never filed until they advertised

18  for help.  If I read it in the newspaper or

19  something like that, then that's when I

20  would apply.  Unless I know that they are

21  hiring, I don't go in and apply.  If I see

22  in the newspaper or I see in the employment

23  office that they were hiring, then I would

## FREEDOM COURT REPORTING

Page 111

1    apply.  Because they've got a thing down

2    there now in the employment office.

3        Q.    So your next application you said

4    was about a year after you finished the

5    class?

6        A.    After they got through with the

7    class and they had started up.  Like I

8    said, I can't be specific about that.  Like

9    I say, I never apply unless I see that it's

10   been advertised, or I see it in the

11   employment office.

12       Q.    When was the next time after

13   that?

14       A.    It's when I applied this last

15   time.

16       Q.    Meaning 2004?

17       A.    Yeah.  See I don't have reason to

18   apply again until Dorsey Trailers had went

19   out of business.  And, I mean, they had

20   shutdowns and layoffs, and when they had a

21   layoff,  I would usually go to -- I would

22   go do aluminum welding at Ala-Fab.  Doing

23   the short times that they had layoff breaks

# FREEDOM COURT REPORTING

1   and stuff like that, Dorsey Trailers,

2   sometimes they would last like a year or

3   something of that nature.

4       Q.   Okay.  So going back to what you

5   told me a minute ago that Bill Woodham

6   said to you about how you should go and get

7   a woman's job -- would that have been right

8   after you finished the class?

9       A.   No, that was further up.  That was

10  -- that was much later.

11      Q.   Okay.  Well, you told me that you

12  applied right after you finished the

13  class.

14      A.   No, I didn't say I applied right

15  after I finished the class.  It was

16  sometime later that I applied again.

17      Q.   About a year;  right?

18      A.   Because after they turned me down,

19  after I didn't come to the class, then I

20  just went on ahead and started doing

21  something else.  And then later on when

22  they applied for welders (sic) and then I

23  applied for a job with them.

# FREEDOM COURT REPORTING

Page 113

Q. Okay.

A. And that's when I passed -- when I took the welding test and I passed the welding test.

Q. Didn't you say that was about a year after you finished the class at Utility Trailer?

A. Like I say, I'm not real clear. You can't hold me down to these dates. It's not really, clear.

Q. I understand that, I'm only asking for your best judgment.

A. I'm not really sure. It could have been a year. It could have been a little later.

Q. After you finished the class?

A. After I got through with the class.

Q. And that's when Mr. Woodham made the comment to you?

A. When I went back and took the welding test, my cousin James Moore, asked him, well, when does she start. She passed

## FREEDOM COURT REPORTING

Page 114

1    the welding test.  He was standing right

2    there when I took it.  He said, she passed

3    the test.  When can she start and he said,

4    well, just call me.  And every time I

5    called he said, well, I'm busy.  Call me

6    again.  And then about the third or fourth

7    time, that's when he went off.  You know,

8    he just, I guess, he just went off.

9        Q.   Okay.  So that would have been in

10    the '80s, sometime after you --

11        A.   It was in the 80's, probably late

12    80's.  Very late '80s.

13        Q.   But you say it was about a year

14    after you took the class; correct?

15        A.   Right.  But you --

16        Q.   Something like that.

17        A.   But don't hold me down to those

18    dates because I'm not sure on those dates.

19    It's not -- I'm trying to go with these

20    dates, you know, like, if I'm not clear on

21    those date and stuff.

22        Q.   I understand that.

23        A.   Okay.

# FREEDOM COURT REPORTING

Page 115

1  Q.  I'm just trying to get a

2  chronology of when things happened in

3  relation to each other.  And I think I'm

4  understanding you to say that Mr. Woodham

5  made that comment to you after you finished

6  the class at Utility Trailer that you

7  entered --

8  A.  Some time later after I applied

9  again for a job there.

10  Q.  Well, let me finish my question

11  before you start to answer just so we can

12  make sure the record is clear.  You filed

13  your EEOC charge against Utlity Trailer

14  sometime in the '80s.

15  A.  Uh-hmm.

16  Q.  And then you entered the class at

17  Utility Trailer.

18  A.  Um-hmm.

19  Q.  And then you filed an application

20  with them something like a year after you

21  finished that class.

22  A.  Something -- or later.

23  Q.  And that's when Mr. Woodham made

# FREEDOM COURT REPORTING

Page 116

1    that comment to you that you should go get

2    a woman's job?

3        A.    Yeah.

4        Q.    Okay.  Let's look back at

5    Defendant's Exhibit 3.  And I'll direct

6    your attention to the pages Bates labeled

7    P133 and P134.  Does that apear to be a

8    true and correct copy of your application

9    for employment with Utility Trailer that

10    you filed on October 5th, 2004?

11        A.    Yes.

12        Q.    And that's your signature on the

13    second page of that document labeled P134?

14        A.    Yes.

15        Q.    And that document is dated October

16    5, 2004; correct?

17        A.    Yeah.

18        Q.    And all of the handwriting on

19    these pages is your handwriting?

20        A.    Yeah.

21        Q.    Okay.  Now, you said something a

22    minute ago about you filed two this last

23    time.  Did you mean that you filed another

## FREEDOM COURT REPORTING

Page 117

1    application besides this one with Utility

2    Trailer?

3        A.    Yeah, because I came in the office

4    and I filled out one, and then I went to

5    the -- I went to the employment office and

6    they had it -- they had it on the -- they

7    had it on the thing.  On the job scan.  And

8    I wrote the number down and took it up to

9    there to Ms. Marsha, she's at the

10   employment office too.  And she told me

11   that that was Utility Trailer and I said, I

12   had just applied there.  And she said, take

13   this back down there, so she gave me a card

14   that they send you, and I took it back down

15   there, and I might have didn't fill out

16   another application.  But I remember giving

17   to the receptionist, and she said that she

18   would see that Ms. Cannon got it.

19       Q.    Now, which one is this one, the

20   documents labeled P133 and 134?  Is that

21   the one you filled out at Utility Trailer?

22       A.    Yeah, I believe this is the one

23   that I filled out at Utility Trailer.

# FREEDOM COURT REPORTING

1    Q.   Okay, and the next one that you

2  said you filled out at the employment

3  office you said that was a card; is that

4  right?

5    A.   See, when you look at a job, you

6  pull it up and write in on the paper, and

7  take it up there.  And they look it up --

8  and they look it up, and she told me that

9  Utility Trailer and I said I had just

10 filled out one there.  Matter of fact, I

11 left there and went straight up there and

12 she gave me -- she filled out a card

13 talking about the job and everything and

14 I'm sending Ms. Thomas in reference to the

15 this job and so I went back down to Utility

16 Trailers and gave it to the receptionist

17 and she said that she would make sure

18 Ms. Cannon got it.

19    Q.   So it was a different type of form

20 than this document.

21    A.   That was a card, yeah.

22    Q.   A card.  Okay.  Do you have a copy

23 of that card?

## FREEDOM COURT REPORTING

Page 119

1    A.    No, because I gave it to the

2    receptionist.

3    Q.    Do you remember what information

4    was on it?

5    A.    It was just basically, it was just

6    a basic card that they give you at the

7    employment office saying, I'm sending Ms.

8    Thomas down to interview for this job, and

9    if you hire, let us know. That's basically

10   all that would be on those cards.

11   Q.    Okay. All right. So any other

12   applications you filed with Utility Trailer

13   after October 5th, 2004, besides the

14   documents labeled P133 and 134 and that

15   card that they gave you at the employment

16   office?

17   A.    I don't think so. Because I think

18   this is the only one that did because when

19   I went back -- I don't remember -- I might

20   have filled out another application but, I

21   really don't remember filling out another

22   application because she give me that card,

23   and I had already filled this one out.

## FREEDOM COURT REPORTING

Page 120

1      Q.    Okay.   I want you to basically

2  take me through the process of how you

3  submitted this application to Utility

4  Trailer and what happened when you

5  submitted it. Starting with what caused you

6  to submit an application.

7      A.    Well, they had an ad in the paper

8  about welders.   I think I got it somewhere

9  in that stuff.   They had an ad in the paper

10 about Utility Trailer needing welders, and

11 so I went over there, and I put in an

12 application, and I think Ms. Cannon was out

13 of town.  I think she was out of town.

14 Because I think the receptionist said that

15 she was out of town, and she would give it

16 to her when she got back.

17     Q.    So you went to the Utility Trailer

18 in person.

19     A.    Yeah, yeah.  She said Ms. Cannon

20 was out of town, and she wouldn't be back

21 -- she wouldn't be back for a few days.   I

22 think that she told me that she would be

23 back that next week. But she would see that

### FREEDOM COURT REPORTING

Page 121

1    she got the application and everything.

2       Q.    Did you talk to anybody else

3    besides the receptionist?

4       A.    No, she gave me a number -- she

5    gave me a number to call -- she said -- she

6    gave me a number -- and next week just call

7    -- just call personnel and Ms. Cannon and

8    gave me a number in which to call and she

9    said I could check on the status of my

10   application at that time.

11      Q.    Okay.  Did she say anything else?

12      A.    No.

13      Q.    Did you say anything else?

14      A.    I said okay.

15      Q.    Okay.  Was anybody with you?

16      A.    No.

17      Q.    All right.  What's the next

18   contact that you had with anybody about

19   your application?

20      A.    Okay.  After that -- I went home.

21   And that next week, I called, I believe.  I

22   believe I got to talk to Ms. Cannon, and

23   she said, I believe she told me that she

# FREEDOM COURT REPORTING

Page 122

1  had my application there and that she would

2  call me -- I believe she said they really

3  had nothing at that particular time and

4  that she would call me -- well, let me get

5  this right, now.  I believe I called her

6  -- I believe I called her that next week.

7  I'm more than sure I called her that next

8  week.  She had told me -- she had told me

9  that she hadn't gotten around to my

10  application at that time.

11      Q.   Okay.  Wait a minute, are we

12  talking about the very first conversation

13  you had after the day you submitted your

14  application?

15      A.   Yes, this was the next week.

16      Q.   Okay.

17      A.   This was the next week.

18      Q.   You talked to someone you think

19  was Ms. Cannon; right?

20      A.   -- and that's who she said she

21  was.  Okay. I say, is this personnel, and

22  she said, yes, this is Ms. Cannon.

23      Q.   Okay. Tell me everything you

# FREEDOM COURT REPORTING

Page 123

1  remember that was said in this

2  conversation.

3      A.   I remember asking about my

4  application, and I remember she said that

5  she hadn't gotten around to it and for me

6  to call her later.  She hadn't got around

7  to it.  So she told me to call her later,

8  and at one point, I believe when I called

9  back, she had told me --

10     Q.   Wait a minute.  Let's stay on that

11 conversation first before we talk about the

12 next one.  What else do you remember about

13 about that conversation?

14     A.   That's it.  When she said that

15 they hadn't gotten around to my application

16 yet.  And for me to just call her back

17 later.

18     Q.   Anything else you remember about

19 that conversation?

20     A.   No, that was it.  And I told her I

21 would call her back.

22     Q.   When was the next contact that you

23 had with anybody about your application?

# FREEDOM COURT REPORTING

Page 124

1    A.    Okay.  And when I called back.

2    Q.    When?

3    A.    Maybe a couple days later, maybe a

4    couple days later.

5    Q.    And what happened?

6    A.    And I believe, again, I talked to

7    Ms. Cannon and she -- I think she had my

8    application somewhere right there or

9    somewhere and she said that did I just talk

10   to you.  And I said, yes, ma'am.  I said, a

11   couple days ago. She said, well, basically,

12   nothing has changed.  I'm still going

13   through applications and I said, okay.

14   I'll just call you back.  I'll  just call

15   you back.

16   Q.    Anything else you remember about

17   that conversation?

18   A.    I believe that was all about that

19   conversation.

20   Q.    Okay.  And when was it next

21   contact you had with anybody about your

22   application?

23   A.    Okay.  Another time -- I don't

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

1  know if it was later on that week or the

2  next week, but I called and I think, again,

3  I asked for personnel and I talked to

4  Ms. Cannon, and I believe that she said

5  that they were going to try and hire one

6  with them.  Sometimes they'll get people

7  and train them for welder and stuff.  A lot

8  of times a company will start within before

9  they start looking on the outside.  They'll

10  try to get someone on the inside.  To

11  either start to weld or do a welding

12  position and I said, well, you know, I said

13  to myself, well, you know, that makes

14  sense.  And I said okay.  And I said that

15  makes sense.  Well, to me it did.  So I

16  said okay.  So I left.

17      Q.   Okay.  Anything else you remember

18  about that conversation?

19      A.   No, no, she just said they were

20  just going to try to hire from within.

21      Q.   Okay.

22      A.   From within the plant.

23      Q.   Okay.  What's the next contact

## FREEDOM COURT REPORTING

1    that you had with anyone about your

2    application?

3         A.    Okay.  You know, I said okay.

4    Because I like I say, I know a lot of

5    companies that do that.  I left and I

6    didn't think anything else about it, and I

7    went back to the employment office, and I

8    was going to look for something else and

9    Marsha, I believe it's Marsha at the

10   employment office, said that someone, she

11   didn't specifically say who, but she said

12   someone had just left because she had told

13   me.  That's when I went back in there the

14   second time, and I took the card up there,

15   and she had said that someone had been

16   there in there looking for welders.  The

17   welding school or looking for welders.  And

18   I said, well, I just filled out the

19   application and left from down there.  She

20   said, well, they were up here looking for

21   welders and looking for someone out of the

22   welding school.  I said well.  When I left

23   there, I went back.  I went back to the

## FREEDOM COURT REPORTING

1    Utility Trailers.

2        Q.    Let me just back up for a second

3    before we get there.  You said you had

4    talked with Marsha Cannon, and she said

5    that they were going to try to hire from

6    within?

7        A.    Yeah.

8        Q.    And was that conversation on the

9    phone or in person?

10       A.    I'm trying to think.  I don't know

11   -- I don't remember if it was in person or

12   on the phone.  I don't remember --

13       Q.    Okay.

14       A.    -- exactly just which way it was.

15       Q.    Okay.  So after that conversation,

16   you said you went back to the employment

17   office, and you spoke with someone named

18   Marsha.  That would be a different Marsha

19   than Marsha Cannon; correct?

20       A.    Yeah.

21       Q.    Okay.  Wait a minute.  Don't

22   answer until after I have finished my

23   question so that she can get everything

# FREEDOM COURT REPORTING

Page 128

down. You said that was a different

Marsha; correct?

    A.   Yes, sir, not this Marsha here,

another Marsha, yeah.

    Q.   All right. And you said that she

said someone had just left who was looking

for welders?

    A.   Yeah, because I had taken and

that's when I went back and I got the thing

off the computer. She said that someone

from Utility Trailers -- it could not have

been Marsha -- had been up there looking

for -- looking for welders. Either there

or out of the school --out of the school.

Either out of the school.

    Q.   So she did not say who it was?

    A.   No.

    Q.   And you didn't --

    A.   If she did, I don't remember.

    Q.   And you did not see whoever it

was?

    A.   No. Evidently, they came in

before I got there.

# FREEDOM COURT REPORTING

Page 129

Q. Okay. And what did she mean by looking for welders?

A. Came in. Put in an order for welders or if anybody -- sometimes they'll go to -- they have welding classes sometimes and sometimes, I guess, but that's what they she told me.

Q. And you said that was the same time she handed you -- she handed you the card that you took back to Utility Trailer?

A. Yeah, I believe that's the only time that I took the card back.

Q. Okay. Did anything else happen at the employment office?

A. No.

Q. Okay anything else about your conversation with Marsha?

A. No.

Q. Okay. So after you left the employment office, then what happened?

A. I think I came back. I came back to Utility Trailers.

# FREEDOM COURT REPORTING

Page 130

1   Q. And let me back up for a second.

2 How long was it after you had that

3 conversation with Marsha Cannon when she

4 said they were going to try to hire from

5 within after you went to the employment

6 office?

7   A. That was after I had called

8 several times to check on my application.

9   Q. Right.  And you said you talked

10 with Marsha Cannon, and she said they were

11 going to try to hire from within.  How long

12 after that before you went to the

13 employment office?

14   A. I was up there.  Evidently, I had

15 been in the office.  Like I said, I didn't.

16 After I was told that I didn't think

17 anything else about that, you know, so I

18 went to back to the employment office to

19 look for something else.

20   Q. Okay.  How long was it after you

21 talked to Ms. Cannon?

22   A. I went on up there.

23   Q. Are you saying it was the same

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660