# Exhibit 2

# (Part 2)

# FREEDOM COURT REPORTING

Page 131

1    day?

2        A.    Yeah.    It was the very same day.

3        Q.    Okay.    All right.    And then you

4    said she gave you the card, and you came

5    back to Utility Trailer.    And how long was

6    it after she gave you the card that you

7    came back to Utility Trailer?

8        A.    I brought the card back.

9        Q.    The same day?  Or later.

10        A.    Now, after Ms. Cannon told me

11    that, I came back.    I wasn't upset about

12    it.    I came back.

13        Q.    Okay.    When are you talking

14    about?

15        A.    It was somewhere in the same time

16    frame.

17        Q.    Well, I'm just trying to get a

18    chronology that's clear.    That's why I keep

19    backing you up because 1 want to make sure

20    the record is clear.    I think you said it

21    was the same day after you talked with

22    Marsha Cannon that they were going to try

23    to hire from within that you went to the

# FREEDOM COURT REPORTING

1   employment office; correct?

2     A.  Uh-huh.  Now, before when I took

3   that card in there, Ms. Cannon hadn't came

4   back.

5     Q.  Okay.  I understand that.  What

6   I'm trying to figure out now is how long

7   was it between when you were at the

8   employment office that you went back to the

9   Utility Trailer with the card?

10     A.  Okay.  I didn't have a second

11   card.  I only had one card.

12     Q.  Okay. I understand that.  I'm

13   talking about the first card.  How long was

14   it between when you got the card that you

15   went to Utility Trailer?

16     A.  I took it straight back when I

17   went to the employment office the same day.

18     Q.  The same day?

19     A.  Yeah, and I took it back.  The

20   same day.

21     Q.  Okay.  And what happened?

22     A.  Ms. Cannon wasn't there.  And the

23   receptionist, she said she woul give

# FREEDOM COURT REPORTING

Page 133

1 Ms. Cannon the card because she was still

2 out of town. Cause it was that same week.

3 Ms. Cannon was still out of town. And she

4 said, I'll put it with your application and

5 I'll give it to Ms. Cannon when she gets

6 back. That's what she said, but Ms. Cannon

7 hadn't gotten back.

8     Q. Okay. Anything else that you

9 remember about that conversation?

10     A. No, there was nothing else to that

11 conversation.

12     Q. Okay. What's the next contact you

13 had with anybody about your conversation?

14     A. Like I said, that next week that

15 very next week when Ms. Cannon got back, I

16 believe it was on a Monday, and I called

17 and she said she had just got back, and she

18 said that she hadn't had time to go through

19 the applications and told me to call her

20 back. I think she might have said to call

21 her back in a couple of days -- to call her

22 back in a couple of days because she had

23 just gotten back in the office and hadn't

# FREEDOM COURT REPORTING

Page 134

1   had time to go through the applications.

2       Q.    This was over the phone?

3       A.    Yeah, yes.

4       Q.    Anything else you remember about

5   that conversation?

6       A.    No.  When she said she had just

7   gotten back and hadn't had time to go

8   through the applications, call her in a

9   couple of days.  I said okay, and that's

10  the end of that conversation.

11      Q.    Okay.  When's the next contact you

12  had with anyone about your application?

13      A.    I believe it was a couple of days

14  later, and I called her back, and I think

15  she said she still hadn't, but she pulled

16  it out and she said, I have your

17  application right here and she said, I

18  still haven't gotten through all the

19  applications yet.

20      Q.    Anything else you remember about

21  that conversation?

22      A.    Not about that conversation so I

23  called her later.

# FREEDOM COURT REPORTING

Page 135

Q.   Okay.  When's the next contact
that you had with anybody about your
application?

A.   Okay.  A few days later, I think I
went in, and if I'm not mistaken and I
could be.

Q.   So you're not sure if you went in
or not?

A.   But I do believe that I did go in.

Q.   But you're not sure if you went in
or not?

A.   Huh-uh.

Q.   That was a no?

A.   No.  I'm not sure which it was.

Q.   You're not sure if you went in or
not.

A.   I'm not sure if I went in or
called her.

Q.   And the reason I ask that is
because you said, Huh-uh.

A.   Yeah, I'm sorry.

Q.   I'm just reminding you that you
need to answer with words.  Okay.  And then

# FREEDOM COURT REPORTING

Page 136

1   what happened?

2       A.    And this conversation I think she

3   told me that they were going to try to hire

4   from within, see if any of their assembly

5   people had any welding experience or if

6   they wanted to be welders or something of

7   that nature.  And that sounded reasonable

8   to me because plants do do that.  I didn't

9   think anything else about it because plants

10  do do that.  They will try to get it out of

11  their workplace they already have

12  especially because welders are kind of hard

13  to come by.  They would go through their

14  workforce.  So that made sense to me, and I

15  didn't think any more about it.

16      Q.    Anything else you remember about

17  that conversation?

18      A.    No.

19      Q.    Okay.  When's the next time that

20  you talked with anybody from Utility

21  Trailer?

22      A.    So when I left there.  Either I

23  either left there, I either left home, or I

## FREEDOM COURT REPORTING

Page 137

1  left there, but I think I left there.  And

2  I went back to the employment office, and I

3  was scanning the register and Ms. Cannon --

4  Ms. Marsha ask me what I'm looking for and

5  I said well, I was looking for a welding

6  job and she said well, Utility's is hiring.

7  I said, well, I already got an application

8  in there and she asked me when did I put it

9  in and I told her, and she said, well,

10  someone had just came in.  I'm not going to

11  say a name because I don't really remember

12  what name it was she did say and they put

13  in an order for welders and some -- maybe

14  they wanted some -- maybe they wanted some

15  from the school.  So I said well, I must

16  have went in there because I said, well, I

17  just left there and they told me they were

18  going to try to hire from within, you know.

19  And she said, I don't know.  They came in

20  and they put in an order, and I said, okay.

21  So when I left that was the end of that

22  conversation with Ms. Marsha.

23      Q.    Okay.  Is that the same thing that

## FREEDOM COURT REPORTING

Page 138

1  you told me about a minute ago, or did that

2  happen twice?

3     A.   No, it just happened once.

4  Because you stopped me and you backed me

5  up.

6     Q.   Okay.  I think we've gotten

7  confused on your chronology.  Because what

8  I'm trying to do is ask you --

9     A.    -- what happened after that?

10    Q.   In order, what events happened in

11 order.  So let's back up.  All right.  You

12 told me you filed your application on the

13 10th, I mean, on October 5th, 2004, and

14 that Ms. Cannon was out of town ask you

15 talked with the receptionist and she gave

16 you a number to call and said next week you

17 can call and talk with Ms. Cannon;

18 correct?

19    A.   Uh-huh.

20    Q.   Okay.  So the next week you called

21 and talked to someone you think was

22 Ms. Cannon and she said she had not been

23 able to go through the applications yet and

## FREEDOM COURT REPORTING

Page 139

1  to call her later; correct?

2      A.    Uh-huh.

3      Q.    Is that a yes?

4      A.    Yes.

5      Q.    Okay.  And then -- and then, what

6  was the next contact you had with anyone

7  about your application?

8      A.    Okay.  I talked -- when I left

9  that time -- probably a couple days later,

10  I called Ms. Cannon again and I believe

11  that is when she told me they were going to

12  try to and hire from within.

13      Q.    Okay.  And you said it was the

14  same day that you went to the employment

15  office;  right?

16      A.    Yeah, after I was told that.  Like

17  I said, after I was told that, that made

18  sense to me because a lot of businesses do

19  do that.

20      Q.    And that's when you had the

21  conversation with Marsha -- a different

22  Marsha at the employment office where she

23  said that somebody from Utility Trailer had

Page 140

1  just come in and put in an order for

2  welders; correct?

3       A.   Uh-huh.

4       Q.   That is that a yes?

5       A.   Yes.

6       Q.   Okay.  What's the next contact

7  after that you had with anybody about your

8  application?

9       A.   Okay.  When she told me that, then

10 I left.  I went back to Utility Trailers

11 and I think I talked -- I got to Ms. Cannon

12 again and she said didn't I just talk to

13 you?

14      Q.   Okay.  Let me back up.  A minute

15 ago you told me that after you left the

16 employment office when they told you that

17 someone had just come in to put in an order

18 for welders that you went back to Utility

19 Trailer the same day and that Marsha Cannon

20 was not there and the receptionist said she

21 would give the card to Marsha when she gets

22 back; is that right?

23      A.   No.  That was when Ms. Marsha was

# FREEDOM COURT REPORTING

Page 141

1    still out of town.  I told you that I went

2    to the employment office.  After Ms. Cannon

3    told me that they were going to hire from

4    within -- within the company -- going to

5    try to hire from within and train people,

6    or something like, and I told that you that

7    a lot of companies do that.

8        Q.    Right.

9        A.    You know, They'll try and hire

10   from within.  And, like I said, that made

11   sense to me.  So I didn't think anything

12   else about it.  I left and I went back up

13   to the employment office.  And I was going

14   through the register.

15       Q.    Okay.  You told me about that.  We

16   talked about what had happened at the

17   employment office.

18       A.    Okay.

19       Q.    I'm not trying to trick you, I'm

20   just trying to find out what happened next.

21       A.    Okay.  That's what I'm trying to

22   tell you.

23       Q.    I believe a minute ago you told

# FREEDOM COURT REPORTING

Page 142

1   me, after you left the employment office

2   you went back to Utility Trailer and

3   Ms. Cannon was not there; is that correct?

4        A.    No, no.  I went back to the

5   employment office and Ms. Cannon was

6   there.

7        Q.    You went back to Utility Trailer?

8        A.    Yes.

9        Q.    Is this the time you told me about

10  a minute ago that you were not sure if you

11  went there physically or if you called?

12       A.    No.

13       Q.    Okay.

14       A.    No, this is after Ms. Cannon said

15  they were going to try to hire from within.

16  And I said that made sense to me because

17  plants, they do do that.  Okay.  Okay.  And

18  then I left and I went back to the

19  employment office.  Okay.  And that is when

20  Ms. Marsha said that someone from Utility

21  Trailers had put in an order for welders or

22  someone from the school.  And I said I just

23  left there, and they told me they were

# FREEDOM COURT REPORTING

1  going to try to hire from within the

2  plant. And she said, well, I don't know.

3  All I know is that somebody came in and put

4  in an order for welders.

5     Q.   We already talked about what

6  happened at the employment office, and I

7  understand what happened at the

8  unemployment office and I'm trying to

9  figure out what happened next.

10     A.   After that I went back -- back to

11  Utility Trailer.

12     Q.   You physically went there in

13  person?

14     A.   Yes, physically went there in

15  person.

16     Q.   All right. And what happened?

17     A.   I asked to talk to Ms. Cannon.

18     Q.    All right.

19     A.    And I asked her about my

20  application again and she said, didn't I

21  just talk to you about this and I said

22  yeah, I'm checking on it again. She said

23  well, if anything comes up, then I have

# FREEDOM COURT REPORTING

Page 144

1   your telephone number and I will let you

2   know if anything comes up, and I stood -- I

3   remember standing there for a moment and at

4   that particular time, I told her that I

5   feel like that I am being discriminated

6   against here.  And Ms. Cannon says, if I

7   remember correctly, and sometimes I might

8   not.  Ms. Cannon says, no you're not being

9   discriminated against.  She said, I don't

10  know you from anyone else.  She said your

11  Social Security number is not even on your

12  application.  She said, I havn't been that

13  long, she said, you know, how would I know

14  to discriminate against you, you know.  And

15  she said your application's not -- your

16  Social Security's not even on your

17  application and I said I know that.  And I

18  think, I don't know if a couple other words

19  were spoken or what, but at that point, I

20  turned around and I left.

21       Q.   Anything else you remember about

22  that conversation?

23       A.   No.

# FREEDOM COURT REPORTING

Page 145

Q.    Okay.  And you were telling me you had that conversation with her in person?

A.    Yeah, yeah, it was in person.  I was there.

Q.    Well, I'll represent to you this is Ms. Cannon sitting next to me on my right.  Is this the person you told me you spoke with?

A.    Yeah, that's the person.  Yes, that's Ms. Cannon.  That's Ms. Cannon.  I know her if I see her.

Q.    All right.  After that, did you have any other contact with anybody from Utility Trailer about your application othert thant the EEOC?

A.    No, I don't feel -- I don't think I -- at that point, I felt like it was just a mute subject.  So I don't believe I had any more contact with them.

Q.    And you did not apply for employment with Utility Trailer subsequently?

A.    After that?

# FREEDOM COURT REPORTING

Q.     Uh-huh.

A.     After I talked with Ms. Cannon?

Q.     Correct.

A.     No, I didn't apply anymore.

MS. HOWARD:  Would you like to take a short break for lunch?

THE WITNESS:  Okay.

(Short recess.)

Q.     Okay.  When we left off before the break, we were talking about your job application with Utility Trailer that is among the documents that were provided in Defendant's Exhibit 3 on pages labeled P133 and P134.  Look on the second page of that application labeled P134 and tell me, what period of time did you indicate that you worked at Dorsey Trailers on that application?

A.     I stayed at Dorsey Trailers -- it should have said 1992 or 1993.  Because in 1993, that's when I went for that conviction.  I started in 1990.

Q.     On the application, you wrote to

# FREEDOM COURT REPORTING

Page 147

1993 to 1999; correct?

A.    It should have been 1990.    That's when I started there.

Q.    Let me re-ask the question because you answered, Hm-mmm.

A.    I'm sorry.

Q.    On the application, you indicated that you worked at Dorsey Trailers from 1993 to 1999; correct?

A.    Yes, that's what I have here.

Q.    And you indicated on your application that your job duties at Dorsey Trailers included welding and working on the assembly line; correct?

A.    Yeah, uh-huh.

Q.    And then looking back on the first page of the application, could you please read me what you wrote on this line?

A.    I was a welder at Dorsey Trailers for five years, and then I went to the assembly line.

Q.    Okay.    Also look now, on the lower left-hand corner of that application, do

## FREEDOM COURT REPORTING

Page 148

you see where it asks, have you ever

applied for work at this company before?

    A.    Uh-huh.  And I explained that.

    Q.    You answered no; correct?

    A.    Yeah, but I think that's one of

the things that was in the thing they sent

me and wanted me to clarify that.  Where it

says, I put no.

    Q.    They sent you?  Who sent you?

    A.    I was sent -- I got it at home

somewhere.  It was in some papers, I

believe, it was Jaquelyn might have been

Ms. Dudley sent me a while back.

    Q.    From the EEOC?

    A.    Yeah, they wanted me to explain --

I guess y'all had pointed that out to them

-- or someone had and she asked me about it

and, like, I wrote and told them, when I

filled the application out, see they only

keep the application for, like, 90 days,

and after that 90 days, you know, that

application is inactive.  And then you come

back and you have to fill out another one

# FREEDOM COURT REPORTING

Page 149

1  and I asked the receptionist, I said, well,

2  I don't remember when the last time I

3  filled out an application.  This is that

4  first one and I say -- I say -- I don't

5  know when -- she say, well, has it been

6  over 90 days.  I said yeah.  She said,

7  well, just put down no because after 90

8  days, they're inactive and you have to put

9  in again, which made perfect sense to me,

10  you know, so that's what I put down.

11      After 90 days, your application is

12  inactive.  I don't even believe they have

13  it anymore, and you have to start all over

14  again.  And she says, it's just like you

15  applying again.  Everytime you apply for

16  something down there, it's  like you're

17  applying for the first time.

18      Q.    When did you have that

19  conversation with the receptionist?

20      A.    When I filled this application

21  out.

22      Q.    All right.  You did not indicate

23  on your application that you had any

# FREEDOM COURT REPORTING

Page 150

welding experience after you left Dorsey

Trailers; correct?

A.    Not at the particular time, no.

Q.    You did not indicate on your

application that you had any experience in

aluminum welding, did you?

A.    They didn't ask me if I had any

experience -- she didn't ask me if I had

any experience in aluminum welding.

Q.    Okay.  And you did not put that in

your application?

A.    No, it says welding.  It don't ask

for the particular ones.  It says welding.

You know, I could understand if that was

the only type of welding that they have

there, but it's not.

Q.    Okay.  And to your knowledge, Ms.

Cannon was not employed with Utility

Trailer when you filed your EEOC charge in

the 80's was she?

A.    No, she wasn't.  I think she had

just recently joined that company when I

-- she hadn't been there long enough.  But

# FREEDOM COURT REPORTING

Page 151

1  no, she was not there when I filed my EEOC.

2     Q.   Okay.  And you don't have any

3  reason to believe that she was aware of

4  your prior EEOC charge at the time you

5  talked with her?

6     A.   You talking about when I filed

7  this report with the EEOC, my lawsuit, when

8  I filed my report with the EEOC?

9     Q.   I'm talking about when you talked

10 with her about your October 2005

11 application.  At that time, you did not

12 have any reason to believe that she had any

13 prior knowledge about your 1983 --

14    A.   She was there when I put in this

15 application.  She was there when I filed --

16 when I filed my EEOC.

17    Q.   In 2004?

18    A.   Yeah.  The first one she was not,

19 you know.

20    Q.   Okay.  I understand that.

21    A.   Yeah, she was there.

22    Q.   Okay.  I understand that, but I'm

23 asking you a slightly different question.

# FREEDOM COURT REPORTING

Page 152

1    A.    Okay.

2    Q.    All right.  You said you had some

3    conversations with Ms. Cannon in 2004 about

4    your 2004 job application; correct?

5    A.    Uh-huh.

6    Q.    At the time you had those

7    conversations with her you had -- and

8    currently, you have no reason to believe

9    that she had any knowledge at that time of

10   your EEOC charge that you had filed back in

11   the '80s.

12   A.    Back in the '80s?  The first one?

13   Q.    Right.

14   A.    Or this one that I'm talking about

15   now.

16   Q.    I'm talking about the one in the

17   '80s.

18   A.    I doubt very seriously if she

19   did.  Because that was way before her time

20   and I -- I don't see how.

21   Q.    All right.  Let's look back at

22   your EEOC charge.  We're looking now back

23   at Defendant's Exhibit 9.  Your EEOC charge

# FREEDOM COURT REPORTING

Page 153

1  from 2004.  In that charge you state that

2  you found out that a white male was hired

3  after the date of your application who had

4  not worked at Utility Trailer before.  Who

5  is that that you're referring to?

6      A.   I think his name's Larry -- I

7  think his name is Larry Helms, H-e-l-m-s.

8      Q.   Okay.  And how did you obtain that

9  information?

10      A.   I obtained that information from

11  -- from a friend of his.

12      Q.   What was that person's name?

13      A.   I don't remember his name right

14  off.

15      Q.   In your notes, again referring

16  back to Defendant's Exhibit 3, the page

17  labeled P71 that we talked about earlier,

18  you make another reference in your notes to

19  a white male hired by Utility Trailer who

20  you claim had no recent welding

21  experience.

22      A.   Not much.

23      Q.   Okay.  Who were you referring to

## FREEDOM COURT REPORTING

1  there?

2      A.    Larry Helms.  The same guy.

3      Q.    Okay.  And how did you obtain that

4  information?

5      A.    Like I say, it was a friend of

6  his.  How I came about that is this guy

7  works at the dealership there in

8  Enterprise, his friend.  He's over the car

9  wash division, and my daughter had started

10  to work there helping him detail car, and

11  we talking about jobs and things, and I

12  told him that I was a welder, that I was

13  looking for a job and he said, Why you

14  don't you go to Utility Trailer, and I

15  said, well, I done been there and he said,

16  a friend of mine had an interview there and

17  then he got hired.  And I said, what date

18  was this and he told me it was well after I

19  had applied.  That's when -- you know, and

20  I was trying to -- he had told me where the

21  guy lived because I wanted to talk to him

22  and he had told me where the guy lived, and

23  he didn't have a phone or anything, and

## FREEDOM COURT REPORTING

Page 155

1   every time I went out there, I couldn't

2   catch him at home.  But I also found out

3   that this guy didn't work there for very

4   long.  I don't know if it was six months,

5   three months, some few months like that.

6   But his welding experience basically was

7   welding --  welding frames on mufflers,

8   tack welding.  Mostly tack welding and

9   stuff like that.

10          Like I said, anybody can pass a

11  welding test.  But it's actually when you

12  get back there and start working, that's

13  when it tells.  Like his application -- his

14  application -- had more or less -- had more

15  or less working at different car

16  dealerships and places like that.  Yeah.

17    Q.   Do you claim that any of the other

18  people that were hired by Utility Trailer

19  as welders in late 2004 were more qualified

20  or less qualified than you?

21    A.   I went through all of those, and

22  there were some real good qualified people

23  there.  I looked at everyone they sent me.

## FREEDOM COURT REPORTING

Page 156

1   I looked at every one that applied.  There

2   was some good ones there and there was some

3   that had very little, and then there was

4   some that had none.  Then the ones that

5   that actually did hire, and I looked

6   through some of those, and some of those,

7   one or two of those, some of those were

8   good and they had good welding experience.

9   Weren't a lot stable but it was good

10  experience and a couple of them, no.  But

11  when I got to Mr. Larry Helms.  That one

12  right there, it just stood way out.  I

13  mean, it just stood way out.

14      Q.   So do I correctly understand you

15  to be saying that Mr. Helms was the only

16  one you allege was less qualified than

17  you?

18      A.   No, there was a couple more that I

19  was right up there with -- that I was right

20  up there with.  But Mr. Larry Helms was, he

21  was in a category all by himself.

22      Q.   Do you remember which other ones

23  who you thought were equally qualified

# FREEDOM COURT REPORTING

Page 157

1  too?

2      A.    No, because his was the only one I

3  zeroed in on.

4      Q.    Do you know anything about any of

5  those people's qualifications for the job

6  other than what you saw on their

7  application?

8      A.    No, I don't.  All I know is what

9  was on their applications.  That's all I

10 know.

11     Q.    Okay.  Have you heard anyone in

12 management at Utility Trailer make any

13 derogatory comments about your sex?

14     A.    No.

15     Q.    Have you ever heard anyone in

16 management at Utility Trailer make any

17 derogatory comments about anyone else's

18 sex?

19     A.    No.

20     Q.    Have you ever heard anybody at

21 Utility Trailer say anything that would

22 lead you to believe that they hold a

23 discriminatory attitude towards women?

# FREEDOM COURT REPORTING

Page 159

and some say the women they do hire, look more like men than woman, you know. But like I say -- like I told you in the beginning, there is some things that I've heard that I can't pin down but I'm trying to and there are some people in there that actually does know what's going on in the inside because -- it seems to me that they do have a problem with women there. It seems to me that they do have a problem with women there.

Q. Okay. But you have never personally witnessed anybody at Utility Trailer saying anything that leads you to believe they hold a discriminatory attitude towards women?

A. No, I havn't personally witnessed that, you know, but some things speak for themselves and some things are fairly obvious.

Q. Are you aware of anybody who may be called as a witness in this case?

A. Not at this particular moment.

## FREEDOM COURT REPORTING

Page 160

1  Like I said from the beginning, I don't --

2  way before I even filed this case  -- back

3  when I was putting in the application and

4  stuff, but I had talked to a lady, she has

5  sinced moved and I was trying to get into

6  contact with her.  But I haven't had any

7  luck so far.  And I know another lady that

8  -- she hasn't worked there but she's put in

9  several applications, she say. But I don't

10 want to list any witnesses until I pin it

11 down. I'm really not going to be at liberty

12 as far as, because right now it is

13 hearsay.

14       I don't have anything -- I know what

15 happened to me, and I got a feeling that

16 I'm probably not the only one that it's

17 happened to but I can't say, you know,

18 well, hey, you can go talk to her and you

19 can go talk to him because I have no real

20 basis for that.  I would have to look into

21 it, and see just -- if it was hearsay.

22 Where is it coming from?  And if I do nail

23 it down to who it's coming from, if they

## FREEDOM COURT REPORTING

1    are not willing to go to talk to me or

2    anybody else, anybody else other than me

3    about it. They're still not doing any of

4    that.

5         Q.   Okay.  Let me just re-ask that

6    last question so that the question will be

7    clear for the record because I think you

8    started your answer before I finished my

9    question.  Are you aware of anybody who may

10   be called as a witness in this case who

11   claims to have personally witnessed anybody

12   at Utility Trailer say anything

13   discriminatory?

14        A.   Not at this time.

15        Q.   And did anybody at Utility Trailer

16   say anything that leads you to believe that

17   you were not hired because of your sex?

18        A.   Can I say Bill Woodham?

19        Q.   Okay.  You're talking about the

20   comment that he made while he still worked

21   there?

22        A.   Comments.  Comments, yeah.

23        Q.   Anything else?

# FREEDOM COURT REPORTING

1      A.    Not at that time.

2      Q.    Okay.   Anybody at Utility Trailer

3  say anything that leads you to believe that

4  you were not hired because you filed a

5  prior EEOC charge in the '80s?

6      A.    No, they haven't said anything.

7      Q.    Do you know anybody that's

8  employed with Utility Trailer?

9      A.    Do I know anybody?  Yes, I know

10  quite a few people over there.   It's a

11  small town.   I know a lot of people who are

12  employed over there.

13      Q.    Have you talked with any of them

14  about you --

15      A.    No, I havn't talked to any of them

16  about it.

17      Q.    Okay.   Let me finish my question

18  before you start your answer.   Have you

19  talked with any of the people you know at

20  Utility Trailer about your applications?

21      A.    No.

22      Q.    And have any of the people that

23  you know at Utility Trailer provided you

# FREEDOM COURT REPORTING

Page 163

1   with any information that you think may be

2   relevant to your lawsuit?

3        A.   Now that, you know --

4        Q.   Other than hearsay.

5        A.   No.

6        Q.   Are there any other people who may

7   have any information relevant to your

8   case?

9        A.   Like I say, I'm not sure.  I

10  can't say yes, and I can't say no.  I don't

11  know.

12       Q.   All right.

13       A.   There is information out there,

14  whether it was relevant to my case, I don't

15  know.

16       Q.   You're speaking of the hearsay

17  that you're trying to track down?

18       A.   Yes, yes, that's what I'm saying.

19  I don't know whether it's relevant to my

20  case or not.

21       Q.   Okay.  As of this moment though

22  you don't know of anybody that has any

23  personal knowledge that would be relveant

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 186

C E R T I F I C A T E

STATE OF ALABAMA      )

HOUSTON COUNTY       )


     I HEREBY CERTIFY that the above and
foregoing transcript was taken down by me
in stenotype, and the questions and answers
thereto were transcribed by means of
computer-aided transcription, and that the
foregoing represents a true and correct
transcript of the testimony ginev by said
witness.

     I FUTRHER CERTIFY that I am neither
of counsel, nor of any relation to the
parties to the action, nor am I anywise
interested in the result of said cause.


     MELIAHA CORNELIUS